USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/27/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SERGIO MEDRANO,

                Petitioner,

      -v.-

UNITED STATES OF AMERICA,

                Respondent.

**REPORT AND**
**RECOMMENDATION**

13-CV-1604 (LTS) (JLC)
06-CR-0061 (RJH)

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Laura Taylor Swain, United States District Judge:**

Petitioner Sergio Medrano brings this petition for relief pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his conviction following his guilty plea to a charge of conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846. In his petition, Medrano raises 15 claims ranging from ineffective assistance of counsel to prosecutorial misconduct and errors in his plea allocution and sentencing. All except Medrano's ineffective assistance of counsel claims are procedurally barred, however, and his ineffective assistance of counsel claims lack merit. Therefore, I recommend that Medrano's petition be denied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Traffic Stop

On November 23, 2004, Medrano was pulled over outside of St. Louis, Missouri by James Hilderbrand, a St. Louis police officer, for tailgating a Mercedes Benz on the freeway. *See* Memorandum of Law in Support of Motion to Vacate, Set Aside or Correct

a Sentence Pursuant to 28 U.S.C. § 2255 ("Pet. Mem."), at 3 (Dkt. No. 1);[1] Declaration of

Assistant United States Attorney John P. Cronan dated August 15, 2013 ("Cronan

Decl.") (Dkt. No. 21), Ex. D (Transcript of Sept. 4, 2008 Suppression Hearing)

("Suppression Tr."), at 3, 5-6.  Medrano provided Officer Hilderbrand with his license,

insurance, and registration, Suppression Tr. at 59, and explained that the car he was

allegedly tailgating was being driven by his cousin, Umberto Medrano ("Umberto"),

with whom he was travelling to San Antonio, Texas.  *Id.* at 5-7.[2]  Officer Hilderbrand

performed a "wanted check" through the El Paso Intelligence Center, which revealed

that Medrano was suspected of involvement in "drug trafficking."  *Id.* at 21-26, 36.

Officer Hilderbrand then asked Medrano to get out of his car, a Mitsubishi Montero.

*Id.* at 25.  Once Medrano was outside of the car, Officer Hilderbrand noticed "bulges" in

Medrano's pants pockets and discovered $5,000 in cash.  *Id.* at 8, 60.

Officer Hilderbrand then searched Medrano's car and found what he

"believed . . . to be a nonfactory false compartment" in the car's roof, typically used for

storing large quantities of money or narcotics.  *Id.* at 11-12; *see also id.* at 39-40.

Medrano denied any knowledge of the false compartment.  *Id.* at 13.  Officer

Hilderbrand notified the police department's "narcotics unit" (a unit assigned to a Drug

Enforcement Administration ("DEA") task force) that he had found what he thought

---

[1] Medrano's *pro se* memorandum in support of his petition begins on page 13 of his motion papers and extends across five attachments.  (Dkt Nos. 1-1 through 1-5). However, Medrano employs a consistent numbering scheme throughout his brief, and accordingly, page number references to Medrano's opening brief will be to the page numbers listed on the bottom of each page rather than the ECF page designations.

[2] During the suppression hearing, Medrano also referred to Umberto as his brother. *See* Suppression Tr. at 64.

was a false compartment in Medrano's vehicle. *Id.* In response, DEA Detective Anthony Moore, Special Agent Kenneth Williams, and Task Force Agents Sam Zouglas and Mark Cox arrived at the scene of the traffic stop approximately 45 minutes later. *Id.* at 16, 33, 42-43.

While Medrano and Officer Hilderbrand waited for the DEA agents to arrive, Officer Hilderbrand told Medrano to call Umberto, who had continued driving when Medrano was pulled over, to have him return to the scene of the traffic stop because Medrano's Mitsubishi Montero would not be released without further inspection. *Id.* at 13-14, 61. Umberto returned and consented to a search of his Mercedes, which also revealed what appeared to be a hidden compartment "behind the rear seat and trunk." *Id.* at 14-15, 30.

The DEA agents arrived and decided, for safety reasons, to "move the stop off the interstate . . . to the Valley Park Police Station." *Id.* at 16, 33, 42-43. At the police station, Detective Moore and Agent Zouglas interviewed Medrano for 15-20 minutes although Medrano "didn't have a lot to say." *Id.* at 47-48. They asked Medrano how to open the hidden compartment, but Medrano repeated that "he didn't know anything about the compartment." *Id.* at 17, 46-47. Ultimately, firefighters from the St. Louis fire department arrived and opened the hidden compartments in each vehicle using a "jaws of life" tool. *Id.* at 17, 31, 33, 47. The hidden compartment in the Mitsubishi contained $117,920 in cash, while the compartment in the Mercedes was empty. *Id.* at 17-18, 47. Officer Hilderbrand called a taxi for Medrano and Umberto and gave them $500 of the $5,000 seized from Medrano to buy bus tickets as their cars were rendered unfit to drive (if not inoperable) by the search. *Id.* at 50, 64.

## B.    Arrest and Indictment

On January 19, 2006, a grand jury in the Southern District of New York returned an indictment that charged Medrano with participation in a conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 812, 841(a), 841(b)(1)(A), and 846.  Cronan Decl., Ex. B (Indictment dated Jan. 19, 2006).  Medrano was arrested on approximately February 1, 2006.  *See* Memorandum of Law of the United States of America in Opposition to Sergio Medrano's Motion ("Resp. Mem."), at 4 (Dkt. No. 20).  On February 24, Medrano made his initial appearance in this District where, represented by court-appointed counsel, he entered a plea of "not guilty."  *See* Cronan Decl., Ex. A (Criminal Docket), at 6.

## C.    Suppression Hearing

Medrano moved to suppress, among other things, the cash found in his Montero and any statements he made to the DEA agents.  *See* Motion to Suppress dated May 20, 2008 (Cr. Dkt. No. 32).  Medrano so moved on the grounds that he did not consent to the search of his car and that the cash was seized without a warrant while Medrano was under arrest without probable cause.  *Id.*  In an affidavit Medrano submitted to the Court in support of his suppression motion, he explained that, during the police stop, he "did not feel free to leave" and "did not consent to the search of [his] car."  Cronan Decl., Ex. C (Affidavit of Sergio Medrano dated July 1, 2008), at ¶¶ 2, 6.

The district court held a suppression hearing on September 4, 2008 at which Medrano, Officer Hilderbrand, and Detective Moore testified.[3]  Officer Hilderbrand and

---

[3] The Honorable Richard J. Holwell presided over Medrano's case, and sentenced him. Following Judge Holwell's resignation from the bench, this case was reassigned to the Honorable Laura Taylor Swain.

Detective Moore's recollections of the circumstances of the traffic stop and subsequent search of Medrano's vehicle were diametrically opposed to Medrano's testimony on nearly every point.

According to Officer Hilderbrand, he asked Medrano to exit his car, at which point he inquired about the bulges in Medrano's pockets. Suppression Tr. at 8. Medrano informed him that it was money, and displayed two bundles of cash upon Officer Hilderbrand's request. *Id.* Officer Hilderbrand explained that, "later in the traffic stop," he asked Medrano, "may I search your vehicle," to which Medrano said "no problem, I'm clean." *Id.* at 8-9, 26-27, 37-39. Officer Hilderbrand conceded that he did not receive Medrano's written consent for the search. *Id.* at 29-30. Officer Hilderbrand further testified that at no point during the encounter did Medrano tell him or any other officer that he no longer consented to the search of his vehicle. *Id.* at 9. Detective Moore testified similarly. *Id.* at 47. Medrano, by contrast, testified that Officer Hilderbrand never asked for his consent to search the Montero. *Id.* at 60, 62. During the initial search, Officer Hilderbrand pulled a piece of the upholstery down to reveal a "nonfactory false compartment." *Id* at 11, 28, 32. Medrano said that Officer Hilderbrand also checked the dashboard with a knife or some other tool, and that, when Medrano asked "why he was poking at the dashboard," Officer Hilderbrand responded "I can do whatever I want to do," and cursed at him. *Id.* at 61.

Officer Hilderbrand further testified that he never placed Medrano under arrest nor did he handcuff Medrano during the interaction. *Id.* at 9-10, 27. He also said that he did not observe any other officers handcuff Medrano or place him under arrest. *Id.* at 16, 18. Detective Moore similarly testified that, when he arrived at the scene,

5

Medrano was standing outside of his car and not in handcuffs, *id.* at 43, and that, throughout the interaction, he never observed Medrano in handcuffs. *Id.* at 48. However, Medrano testified that Officer Hilderbrand "handcuffed [his] right hand to the steering wheel" and proceeded to search his car. *Id.* at 61. He further said that, when the other officers arrived at the scene, he was in handcuffs. *Id.* at 63.

Regarding the relocation to the police station, Detective Moore explained that, after he and the other officers arrived at the scene, Agent Zouglas asked Medrano "if he would voluntarily come [to the police station]," and Medrano agreed. *Id.* at 44-45. However, the officers also explained to Medrano that, while he and Umberto "were free to leave, the vehicles were not." *Id.* at 57-58. Again, in contrast, Medrano said he was not asked whether he would go voluntarily to the police station, but instead was forced to do so. *Id.* at 63.

The officers testified that they left Medrano and Umberto sitting on a bench unsupervised after they arrived at the station. *Id.* at 45. Detective Moore observed that, if Medrano had wanted to leave, he could have walked out the front door. *Id.* Medrano disagreed, testifying that he did not feel free to leave and "did not feel that [he] had any rights because [he] was under their power and [he] did not know what to do." *Id.* at 63. Detective Moore testified that Agent Zouglas asked Medrano if he would be willing to speak with him, *id.* at 45, to which Medrano replied that "he would talk to [them], but he didn't know anything about the . . . trap inside the Montero." *Id.* at 46, 72-73. By contrast, Medrano said that he was not asked whether he would participate in an interview, but also explained that, during the interview, he was not in handcuffs. *Id.* at 63. He added that no one presented him with a consent form for the interview.

*Id.* at 58.

The testimony also diverged as to Medrano's ability to speak and understand English. Both Officer Hilderbrand and Detective Moore testified that Medrano conversed with them in English. *Id.* 7, 48-49. Detective Moore even said that Medrano told them "he spoke English. He understood English." *Id.* at 48-49. Medrano testified that he understood Officer Hilderbrand's request for his license, insurance, and registration, *id.* at 62, but that he told one or more of the officers that he did not speak English. *Id.* at 70.

On one point there was some agreement. Officer Hilderbrand and Detective Moore said that neither they nor any other officers threatened Medrano nor used any force against him. *Id.* at 10, 16, 18-19, 44-45. Medrano also testified that, during his interaction with the officers, he was never threatened, never told "bad things would happen to [him] if he refused to consent to the search" or to go to the police station, that he could not leave, or that he had to speak with the officers. *Id.* at 71. However, Medrano explained that he felt he "had no other recourse because [he] was in their power and [he] didn't know what to do. [He] felt that [he] was locked up." *Id.*

After the hearing, Medrano submitted a supplemental brief in support of his motion, in which he again argued that the stop constituted an arrest and that any alleged consent to search his vehicle or participate in an interview with DEA agents was not voluntarily given. *See* Cronan Decl., Ex. E (Supplemental Brief in Support of Defendant's Motion to Suppress Evidence filed Sept. 19, 2008). He further argued that Officer Hilderbrand "went beyond the original scope of the consent when he began to tear up the vehicle." *Id.* at 9. The Government also filed a post-hearing brief in

opposition to Medrano's motion to suppress.  (Cr. Dkt. No. 40).

On October 8, 2008, the district court issued an oral ruling denying Medrano's motion.  *See* Cronan Decl., Ex. F (Transcript of Oct. 8, 2008 Proceeding).  In reaching this decision, the district court credited Officer Hilderbrand's testimony that he asked for and received consent for the search from Medrano and that Medrano was never handcuffed.  *Id*. at 9.  The district court also credited Officer Hilderbrand and Detective Moore's testimony to find that *Miranda* warnings were not required because Medrano was not in custody, having voluntarily consented to go to the police station.  *Id*. at 13. While the district court noted that, because both the Montero and the Mercedes were seized, Medrano did not have an alternative means of leaving the scene of the traffic stop, it found that these circumstances did not render Medrano in custody because he could have asked the officers to take him somewhere other than the police station or could have immediately called a taxi once he arrived there.  *Id*. at 13-14.

**D.    Guilty Plea**

On October 15, 2008, Medrano pleaded guilty to conspiracy to distribute five kilograms or more of cocaine.  *See* Cronan Decl., Ex. G (Transcript of Oct. 15, 2008 Plea Proceeding) ("Plea Tr.").  At the plea proceeding, the Government explained the elements of the crime to which Medrano was pleading guilty.  *Id*. at 7-8.  The Government noted that, among other things, the evidence it was prepared to offer against Medrano at trial included the November 2004 seizure of Medrano's "car with a trap in it, with currency in it, as well as another car with an empty trap," and "the seizure of another car that's affiliated with Mr. Medrano that also had a trap or secret compartment in it along with nearly a million dollars."  *Id*. at 12-13.

After Medrano explained that he was "pleading guilty because [he] had some communication with some people" and that his guilty plea was with respect to "the seizure of five kilos," the district court engaged in the following colloquy with Medrano:

> *Court*: Did you enter into this agreement with your co-conspirators willingly and knowingly?
> *Medrano*: Yes.
> *Court*: Did you understand that what you were doing was a crime?
> *Medrano*: I know that I made a mistake. Yes I did.
> *Court*: Yes, you did understand what you were doing was a crime?
> *Medrano*: Yes.

*Id.* at 14-15.

The district court also asked Medrano if he understood that "the maximum possible penalty for this crime is life imprisonment" and that "there is a mandatory minimum penalty of ten years imprisonment and five years of supervised release." *Id.* at 8-9. Medrano responded that he understood. *Id.* When explaining how it would apply the Sentencing Guidelines, the district court noted that it "can go up to the statutory maximum sentence of life imprisonment." *Id.* at 10-11. At the end of the plea hearing, Medrano's counsel emphasized that Medrano wanted to preserve his right to "debrief on a safety valve basis," which the district court confirmed. *Id.* at 19.

### E.   *Fatico* Hearing

Over two days in early 2009, the district court held a pre-sentencing hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), to resolve Medrano's eligibility for safety valve relief pursuant to 18 U.S.C. § 3553(f) and to calculate the range of Medrano's sentence under the Sentencing Guidelines. Specifically, the court considered the weight of cocaine at issue and the propriety of sentencing enhancements for Medrano's supervisory role in the conspiracy and for obstruction of justice. *See*

9

Cronan Decl., Ex. H (Transcript of Jan. 16 and Mar. 17, 2009 Hearings) ("Fatico Tr.").
Medrano testified at the hearing and the Government presented two cooperating
witnesses: Thomas O'Neill and DiFrank Medina.

### 1.    Medrano's Testimony

In his testimony, Medrano presented himself as having a very limited role in
what the Government alleged was a wide-ranging cocaine trafficking conspiracy.
Medrano said that he never transported or instructed anyone else to transport illegal
drugs, id. at 8, 12, 27-28, and he again denied any knowledge that there were traps in
the Montero and Mercedes. Id. at 23-25.

According to Medrano, he became involved in the cocaine conspiracy through his
friend, Sergio Navarro. Id. at 14. Medrano said that Navarro introduced him to a man
named Johan Moreno, who the Government alleged was responsible for the New York
branch of the conspiracy. Id. Medrano explained that, in July or August of 2003,
Moreno asked Medrano to introduce him to someone named "el Guero," whom Medrano
said he knew only as a customer of his auto body shop in Illinois. Id. at 7, 19-21.
Moreno also asked Medrano whether he knew anyone who could provide Moreno with a
large quantity of drugs. Id. at 18-19. Then, in September or October of 2003, Moreno
asked him to transport a car to New York, explaining that it was related to "drugs or
something," but Medrano said he "wouldn't drive anywhere with drugs," and therefore
refused. Id. at 10. Medrano also testified that, in early 2004, he met Moreno in a hotel
where Moreno instructed him to put certain cars in his name. Id. at 9-10. Despite
Medrano having met Moreno only two or three times, at some point, Moreno gave him
$70,000, which Medrano described as a loan for his business. Id. at 8, 14-15. Medrano

said that, until he was arrested, he did not realize that either Moreno or Navarro was involved in cocaine trafficking. *Id.* at 14.

Medrano also testified about his relationship with Thomas O'Neill, one of the Government's cooperating witnesses. He explained that O'Neill delivered money to him from either Moreno or Navarro "to keep for Navarro." *Id.* at 11. In total, Medrano said he met with O'Neill, "like three times when I would go with Johan Moreno to Navarro to – when I would go to drop off a car." *Id.* He denied sending O'Neill anywhere in a vehicle containing cocaine. *Id.* at 29-31, 32-33.

### 2.   Thomas O'Neill's Testimony

O'Neill testified that he became involved in the cocaine trafficking conspiracy "shortly after Labor Day of 2003" when Navarro, whom O'Neill knew as his personal cocaine dealer, raised the possibility of registering a car in his name and transporting cocaine to New York. *Id.* 35-37. A few weeks later, O'Neill drove a shipment of cocaine to New York and returned the car to Navarro after Moreno had loaded it with cash. *Id.* at 37-40. O'Neill said that he first met Medrano when retrieving the car for his second trip to New York in late September or early October 2003. *Id.* at 41, 66. During this meeting, Navarro and Medrano discussed with O'Neill the cocaine that was stored in the car. *Id.* at 42. He also confirmed that he heard Navarro refer to Medrano as "Toca"—O'Neill "heard [Navarro] use the name on the phone a number of times. And when he would get off the phone he would say that was . . . Sergio Medrano." *Id.* at 59. However, he never heard anyone else refer to Medrano as "Toca." *Id.* at 88.

O'Neill further linked Medrano to his transporting cocaine to New York. On a trip in late December 2003 or early January 2004, O'Neill drove a Montero with cocaine

11

stashed in a roof compartment, and testified that he had previously seen the same Montero at Medrano's shop. *Id.* at 45-46. On another trip, while en route from New York to Chicago, "Mr. Navarro said he was going to be unavailable when I got home, and he told me to instead go to Medrano's body shop to drop off the cash." *Id.* at 57, 73. When he arrived at the body shop, Medrano's employees "pulled the vehicle into the body shop," but he "never saw the cash removed." *Id.* at 74. O'Neill further testified that he never saw Medrano or any of his employees handle cocaine. *Id.* at 90. On another occasion, Medrano asked O'Neill if he knew "the possible whereabouts of Johan Moreno in New York" because Moreno was not returning his calls. *Id.* at 58.

O'Neill also explained that he transported cocaine for Medrano directly. *Id.* at 48-55, 84-85. He said he made two trips to Columbus, Ohio, during which he delivered nine kilograms and between two and four kilograms of cocaine, respectively, to "Guero." *Id.* at 50-53. On one of the trips, he returned with money from Guero that he personally deposited in the car's hidden compartment and delivered to Medrano's body shop. *Id.* at 54-55, 91-92. Medrano then paid him $5,000. *Id.* at 54-55. Medrano also raised the possibility of O'Neill driving to Michigan and Texas for him. *Id.* at 49, 59.

### 3.   DiFrank Medina's Testimony

The government's second witness, DiFrank Medina, testified that he became involved in the conspiracy in September 2003 when he started working for Moreno. *Id.* at 124. However, he had met Moreno earlier, in November 2000, when Moreno arrived at Medina's home with a man named Sergio. *Id.* at 122-23. Medina explained that he was aware of two men named Sergio in the narcotics trafficking conspiracy: the one who arrived at his home with Moreno in November 2000 and Medrano, whom he also

12

knew as "Toca." *Id.*

Shortly after Medina began working for Moreno, Moreno asked him to procure a car with a hidden compartment large enough to transport 25-30 kilograms of cocaine from Chicago. *Id.* at 128-30. With money from Moreno, he bought a BMW convertible and had his friend install a trap. *Id.* at 129. The car returned to New York in October driven by a "Mexican with a little dog who worked for Mr. Toca" and storing 14 kilograms of cocaine. *Id.* at 131.

Medina also coordinated the installation of roof traps in two Mitsubishi Monteros: one for Moreno and one for Medrano, whom he referred to as "Mr. Toca." *Id.* at 133-35. Medina testified that, in November 2003, he and his friend, who installed car traps, met with Medrano and Moreno. *Id.* at 134. At this meeting, Moreno referred to Medrano as "Toca" and Medrano did not correct him. *Id.* at 190. Medina learned from Moreno that Medrano wanted the car to bring drugs from Mexico to Chicago. *Id.* at 135. Specifically, Moreno said that Medrano wanted a vehicle that could hold more than 50 kilograms of cocaine. *Id.* at 189.

Medina testified that he next saw Medrano in mid-December 2003 at a restaurant in the Bronx. *Id.* at 139, 191. Medina learned from Moreno that Medrano was in town with a tractor trailer carrying 180 kilograms of cocaine driven by an unnamed Mexican man. *Id.* at 141, *see also id.* at 172, 177-78. The truck was subsequently driven to North Carolina to be unloaded because Moreno's men were unable to open the trap in New York. *Id.* at 139-41.

Medina then saw Medrano in January 2004 at a McDonald's on the Upper West Side of Manhattan. Moreno sat with Medrano, while Medina sat at a different table.

13

*Id.* at 143. Afterwards, Moreno informed Medina that he needed to collect money for
the 180-kilogram shipment because Medrano needed the money to pay other people.
*Id.* at 144. Medina and Moreno collected $4 million, $2 million of which Moreno
packaged for delivery to Medrano in Brooklyn. *Id.* at 145. Medina and Moreno went to
a McDonald's in Brooklyn where Medina saw "Toca and the other Mexican" eating.
Moreno instructed Medina to have his brother deliver the money, following "Toca" in
his car after Toca left the McDonald's. *Id.* at 146, 191-92. The other $2 million
collected was for "Cuco," who the Government alleged was responsible for the California
branch of the conspiracy. *Id.* at 184. Medina also testified that, sometime later,
Moreno gave Medrano a Mercedes, ostensibly to pay off more of the debt connected to
the 180-kilogram shipment. *Id.* at 149-50.

Medina explained that, over the course of the conspiracy, he saw Medrano on
five occasions. *Id.* at 166. Throughout his testimony, Medina made it clear that when
he referred to "Toca," he meant the defendant, Medrano. While Medina testified that
he never heard anyone other than Moreno refer to Medrano as "Toca," *id.* at 173-74, he
explained that "when I met [Medrano], Johan [Moreno] told me he's Toca. Every time
[Moreno] went to meet with [Medrano], 'I'm going to meet with Toca.'" *Id.* at 178. Each
time, Medina accompanied Moreno and saw him speak with Medrano. *Id.*

### 4.   Potential Defense Witnesses

At the end of the first day of the *Fatico* hearing, Medrano's counsel advised the
court that Medrano "wishes for me to call the three individuals that were set for trial in
this case" as well as an individual named Adolfo Vasquez. *Id.* at 158. The court
requested a letter brief, *id.*, but the docket does not reflect that counsel ever submitted

14

one. At the end of the second day of the hearing, Medrano's counsel repeated the request to examine additional witnesses, and identified the following four people: Cleofas Contreras Vasquez, Juan Nicholas Ordenas, Adolfo Vasquez, and Juan Ernesto Garcia. *Id.* at 198. He proffered that "all four individuals can testify as to the drug shipments and how they are involved with the Cuco conspiracy and not [Medrano]." *Id.* He also promised they could testify that Medrano "was not known as 'Toca,' but another individual was known as that name." *Id.* The Government countered that these additional witnesses were unnecessary and would provide cumulative testimony. It proffered that there was also someone in the Cuco branch of the conspiracy named "Toca," but it believed that O'Neill and Medina were sufficiently clear in their testimony that the "Toca" to which they each referred was Medrano. *Id.* at 199-200.

When the district court asked Medrano's counsel to further specify the nature of the proposed testimony and whether the 180-kilogram shipment that Medina had testified about was part of the Cuco conspiracy, counsel explained, "to be totally honest, the question is they may. I do not have direct knowledge either way that they will or will not or they can or cannot [testify]. I believe that they can. I'm just not certain that they will." *Id.* at 201. Medrano's counsel submitted a letter providing additional details about the expected testimony. Cronan Decl., Ex. L (Letter from Cristobal M. Galindo dated June 11, 2009). The Government submitted a letter in opposition in which it observed that Medrano's counsel still had not attempted to contact the proposed witnesses or their counsel. Cronan Decl., Ex. M (Letter from Michael D. Maimin dated Aug. 14, 2009), at 3. Medrano's counsel did not contest the Government's recitation of this fact.

15

By order dated January 29, 2010, the district court denied Medrano's request to extend the *Fatico* hearing without prejudice to Medrano submitting evidence that the proposed witnesses would, in fact, be willing to testify and that they could testify that all or some of the 180-kilogram cocaine shipment was not attributable to Medrano or that Medrano did not have a managerial role in the conspiracy. Cronan Decl., Ex. N (Order dated Jan. 29, 2010). Medrano's counsel did not thereafter submit any additional evidence regarding the proposed witnesses.

### F.   Sentencing

On May 13, 2010, Medrano moved to withdraw his guilty plea, and asked the district court to appoint new defense counsel. *See* Affirmation of Matthew W. Brissenden dated November 25, 2013 ("Brissenden Aff."), Ex. D (Motion for Withdraw [*sic*] of Plea of Guilty dated May 13, 2010); Motion to Withdraw as Counsel dated May 13, 2010 (Cr. Dkt. No. 59); *see also* Brissenden Aff., Ex. B (Letter from Medrano to Galindo dated Apr. 1, 2010). The district court appointed new counsel, (Cr. Dkt. Nos. 63, 65), and by letter dated August 30, 2010, Medrano's new counsel informed the district court that Medrano no longer desired to withdraw his guilty plea. Cronan Decl., Ex. O (Letter from Avrom Robin dated Aug. 30, 2010). Instead, Medrano's counsel submitted a sentencing memorandum arguing that Medrano should receive a 121-month sentence. *See* Brissenden Aff., Ex. D (Sentencing Memorandum filed Jan. 7, 2011). Medrano himself also submitted a supplemental sentencing memorandum. *See* Affidavit of Sergio Medrano dated November 18, 2013 ("Medrano Aff."), at ¶ 20, Ex. B (Pro Se Brief in Further Support of a Non-Guideline Sentence Pursuant to § 3553(a) &

(f), undated).[1]  In his *pro se* memorandum, Medrano reiterated certain of the arguments made by counsel and added the theory that Juan Nicholas Ordenas was the "Toca" responsible for the 180-kilogram cocaine shipment.  Medrano Aff., Ex. B, at XXII.

The district court sentenced Medrano over the course of two days—on October 27, 2011 and December 15, 2011. *See* Cronan Decl., Exs. I (Transcript of Oct. 27, 2011 Sentencing), J (Transcript of Dec. 15, 2011 Sentencing).  On the question of the drug weight, the district court found O'Neill "entirely credible" regarding the smaller cocaine shipments he transported for Medrano.  Cronan Decl., Ex. I, at 16.  The district court also found Medina credible, but somewhat uncertain as to whether Medrano was responsible for the entire 180-kilogram shipment or only half of it.  *Id.* at 15.  Therefore, the district court concluded that Medrano was responsible for between 50 and 150 kilograms of cocaine, a base offense level of 36.  *Id.* at 16.  Regarding Medrano's role in the conspiracy, the district court found that, based on his interactions with O'Neill and Medina, Medrano had a leadership role in the conspiracy and that the conspiracy involved at least five people.  *Id.* at 21.  The court therefore imposed a four-level enhancement.  *Id.*  The district court also added a two-level enhancement for Medrano's obstruction of justice.  *Id.* at 25-26.  Specifically, the district court explained that it credited the officers' testimony at the suppression hearing and O'Neill and Medina's testimony from the *Fatico* hearing, and therefore, Medrano had "intentionally made false statements under oath." *Id.*  Despite the obstruction finding, the court also subtracted two levels for Medrano's acceptance of responsibility based on his guilty plea.  Cronan Decl., Ex. J, at 26.  With the sentencing enhancements and reductions

---

[1] Medrano's *pro se* sentencing submission does not appear on the criminal docket.

taken into account, the district court calculated the sentence range as 292 to 365 months; however, it sentenced Medrano to 262 months in prison with five years of supervised release based on the sentences other members of the conspiracy had received. *Id.* at 25-29, 30-31.

## G.   Direct Appeal

Medrano, represented by new counsel, appealed his conviction to the Second Circuit on June 29, 2012. *See* Cronan Decl., Ex. K (Medrano's appellate brief dated June 28, 2012). In his appeal, Medrano argued that the district court erred in accepting his plea because he did not allocute to a knowing participation in the cocaine trafficking conspiracy. *Id.* at 21-26. Medrano further argued that the district court made two errors at sentencing—first, in finding that Medrano was responsible for 50 or more kilograms of cocaine and second, in subjecting Medrano to a four-level leadership enhancement. *Id.* at 40-42. He also raised several claims regarding the ineffective assistance of counsel. In particular, he challenged Cristobal Galindo's failure to: (1) move to dismiss the indictment on Speedy Trial Act grounds; (2) advise him of the consequences of an open plea; (3) argue at the suppression hearing that the search of Medrano's vehicle exceeded the scope of his "purported consent;" and (4) conduct an "appropriate investigation" prior to Medrano's *Fatico* hearing. *Id.* at 28-33, 35-40. With respect to sentencing counsel, Avrom Robin, Medrano argued that he had an actual conflict of interest resulting from his prior representation of Ordenas, who Medrano contended (and still maintains) is responsible for the 180-kilogram cocaine shipment that the district court partially attributed to Medrano. *Id.* at 33-35.

On February 6, 2013, the Second Circuit rendered a decision on Medrano's

18

claims, but declined to address his ineffective assistance of counsel arguments, finding

that "this case demands further factual development," and is therefore "better

presented in a 28 U.S.C. § 2255 petition." *United States v. Medrano*, 511 F. App'x 40,

43 (2d Cir. 2013). Reviewing Medrano's plea allocution for "plain error" because

Medrano had not challenged the sufficiency of his plea in the district court, the Second

Circuit found that there was "little ambiguity" that Medrano allocuted to each element

of the crime with which he was charged. *Id.* at 41. Particularly, Medrano "responded

affirmatively that he 'willingly and knowingly' entered into 'an agreement, a plan' he

understood to be a crime 'involv[ing] the distribution or possession with the intent to

distribute five kilograms or more of cocaine.'" *Id.* at 41-42.

The Second Circuit also determined that there were no errors with the district

court's calculation of Medrano's sentence. Regarding the quantity of cocaine, the

Second Circuit found no reason to question the district court's assessment of Medina's

credibility, which testimony supported the district court's finding that Medrano was

responsible for at least half of the 180-kilogram shipment of cocaine. *Id.* at 42.

Regarding the leadership sentencing enhancement, the Second Circuit reviewed *de*

*novo* the district court's application of the enhancement and "the findings of fact

supporting [the district court's] conclusion for clear error." *Id.* It found that the

evidence presented at the *Fatico* hearing demonstrated that the conspiracy involved "at

least thirteen members" and that Medrano was an "organizer or leader," such that "it

was well within [the district court's] discretion to conclude that Medrano managed at

least one other participant." *Id.* The Court therefore affirmed Medrano's conviction.

19

**H.    The Instant Petition**

Medrano, proceeding *pro se*, filed the instant petition on March 8, 2013 in which he raises 15 different, although somewhat overlapping, grounds for relief.  In his petition, Medrano challenges his conviction on the following grounds:

1. The district court erred in accepting Medrano's guilty plea because he "did not allocute to his knowing participation in the alleged conspiracy."
2. His counsel was ineffective in failing to advise Medrano of the risks of an open plea.
3. His counsel was ineffective for failing to investigate in preparation for the *Fatico* hearing.
4. His counsel was affected by an "actual conflict."
5. His counsel was ineffective for failing to move to dismiss the indictment on Speedy Trial Act grounds.
6. His counsel was ineffective for failing to argue that the search of Medrano's vehicle exceeded the scope of his "purported consent."
7. The district court erred in finding that 50 or more kilograms of cocaine were at issue in the conspiracy to which Medrano had pleaded guilty.
8. The district court erred in applying a four-level leadership enhancement to Medrano's sentence.
9. The Government obtained an indictment against Medrano through misconduct before the grand jury.
10. The Government withheld exculpatory evidence in violation of *Brady* and *Giglio*.
11. The Government's prosecution of Medrano was "outrageous" in light of their previous prosecution of Ordenas "employing the same cocaine, money and confederates."
12. His counsel was ineffective for failing to present Medrano with the plea agreement the Government had offered him.
13. His counsel was ineffective for failing to disclose his conflict of interest.
14. The district court erred in applying a two-level enhancement to Medrano's sentence for the obstruction of justice.
15. "Cumulative errors undermine the credibility of [Medrano's] conviction, as a manifest injustice."

*See* Pet. Mem. at 11-13.

The Government submitted its opposition to Medrano's motion on August 16, 2013.  (Dkt. Nos. 20-21).  It contends that all of Medrano's claims—except for those involving ineffective assistance of counsel—are procedurally barred either because the claims were decided on the merits on direct appeal (Claims 1, 7-8) or because Medrano

failed to raise the claims on direct appeal (Claims 9-11, 14-15). Resp. Mem. at 17-35. The Government further argues that the Court should deny Medrano's ineffective assistance of counsel claims based on the record before it without holding a hearing. Resp. Mem. at 35-56.

Because Medrano raised claims regarding the ineffective assistance of counsel that might require factual development, including a hearing, the Court granted Medrano's motion for the appointment of counsel. (Dkt. Nos. 18, 22).[5] On November 25, 2013, Medrano, now represented by counsel, filed a reply memorandum in further support of his petition, which focused on the ineffective assistance of counsel claims (Claims 2-6, 12-13) and the alleged *Brady* violation (Claim 10). *See* Reply Memorandum of Law in Further Support of Petitioner's Motion ("Pet. Reply") (Dkt. No. 30). The Court directed the Government to submit a response to Medrano's counseled brief, which it filed on March 21, 2014. *See* Government's Supplemental Memorandum of Law ("Resp. Supp. Mem.") (Cr. Dkt. Nos. 102-03).[6]

In connection with Medrano's ineffective assistance of counsel claims, the Court

---

[5] On July 31, 2013, the Court recommended to Judge Swain that Medrano's motion for the appointment of counsel be granted because of the Second Circuit's decision requiring that there be further factual development of Medrano's ineffective assistance of counsel claims. (Dkt. No. 18). On August 20, 2013, Judge Swain adopted the report and recommendation and appointed Matthew Brissenden, who served as Medrano's counsel on direct appeal, (Dkt. No. 22), as he had advised the Court that he would accept the assignment if Medrano's motion were granted. (Dkt. No. 9, at 5).

[6] Certain documents have been filed on the underlying criminal docket rather than the civil docket for Medrano's *habeas corpus* petition. To the extent a document was filed on both the criminal and civil dockets, I will refer to the civil docket entry number. Citations to "Cr. Dkt." refer to docket entries made only on the criminal docket, 06-CR-61 (RJH).

directed Medrano's former attorneys, Galindo and Robin, to submit testimony in the form of an affidavit addressing Medrano's ineffective assistance allegations as they pertained to each of them. (Dkt. Nos. 13-14). By order dated October 27, 2014, the Court subsequently directed Galindo to submit a supplemental affidavit as his first did not fully address all of Medrano's claims of ineffectiveness, which Galindo filed on November 24, 2014. (Dkt. No. 38; Cr. Dkt. No. 106). The Court also requested briefing from the parties related to Galindo's supplemental affidavit, which after several extensions was completed on January 16, 2015. (Dkt. No. 44; Cr. Dkt. No. 107).

## II.    DISCUSSION

### A.    Standard of Review

#### 1.    Law Governing Section 2255 Motions

Section 2255 provides a prisoner in federal custody with a limited opportunity to challenge collaterally the legality of the sentence imposed on him. *United States v. Addonizio*, 442 U.S. 178, 185 (1979). To obtain relief under 28 U.S.C. § 2255, the prisoner must show that his sentence: (1) was imposed in violation of the U.S. Constitution or the laws of the United States; (2) was entered by a court without jurisdiction to impose the sentence; (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Collateral relief is available only for a constitutional error "that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). As the Second Circuit has explained, "[t]he reasons for narrowly limiting the relief permitted under § 2255—a respect for the finality of criminal sentences, the efficient

22

allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place—are 'well known and basic to our adversary system of justice.'" *Bokun*, 73 F.3d at 12 (quoting *Addonizio*, 442 U.S. at 184 & n.11).

Further limitations have been established on a federal prisoner's right to collaterally challenge his sentence. First, it is well-established that a § 2255 petition "cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" *Reese v. United States*, 329 F. App'x 324, 326 (2d Cir. 2009) (quoting *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001)); *accord Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) ("[T]he so-called mandate rule bars re-litigation of issues already decided on direct appeal."). However, a court may "reconsider an earlier decision when we are confronted with 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)); *accord Chin v. United States*, 622 F.2d 1090, 1092 (2d Cir. 1980) ("Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal.").

The inverse of this rule is that "[a] habeas action is not intended to substitute for a direct appeal." *Fountain v. United States*, 357 F.3d 250, 254 (2d Cir. 2004) (citing *United States v. Frady*, 456 U.S. 152, 165 (1982)). Accordingly, "[w]here a petitioner does not bring a claim on direct appeal, he is barred from raising that claim in a subsequent section 2255 proceeding unless he can establish both cause for the procedural default and actual prejudice resulting therefrom." *Rosa v. United States*,

170 F. Supp. 2d 388, 396 (S.D.N.Y. 2001) (collecting cases); *accord Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) (requiring "cause" for the failure to appeal resulting in "actual prejudice" or proof of "actual innocence") (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "To satisfy the 'cause' requirement, the petitioner must show circumstances 'external to the petitioner, something that cannot be fairly attributed to him.'" *Zhang*, 506 F.3d at 166 (quoting *Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 508 (S.D.N.Y. 2005)) (internal quotation marks omitted). To prove "actual prejudice," the petitioner must show that the alleged errors "resulted in 'substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions.'" *Gutierrez v. Smith*, 702 F.3d 103, 112 (2d Cir. 2012) (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)).

A hearing is not necessary to adjudicate a § 2255 motion if the petition and the record "conclusively show[] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). A court has discretion to determine whether a hearing is needed. *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003). Stated differently, section 2255 "does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" *Gonzalez v. United States*, 722 F.3d 118, 130-31 (2d Cir. 2013) (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). Generally, "'[t]he procedure for determining whether a hearing is necessary is in part analogous to . . . a summary judgment proceeding. . . . If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made.'" *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011) (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)); *see also Gonzalez*, 722 F.3d at 131 ("To warrant a hearing, the motion must set

24

forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."). Rather than conducting a hearing with live testimony, a court may instead take the "middle road," *Pham*, 317 F.3d at 184, and rely on written submissions from the parties, including affidavits, thereby avoiding "delay [and] the needless expenditure of judicial resources." *Puglisi*, 586 F.3d at 215 (citation omitted).

### 2. Law Governing Ineffective Assistance of Counsel Claims

Claims of ineffective assistance of counsel are analyzed using the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim, a petitioner must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) (citation omitted); *see also Santone v. Fischer*, 689 F.3d 138, 154 (2d Cir. 2012).

Under the first *Strickland* prong, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In evaluating counsel's effectiveness, a court must assess the case from the viewpoint of the attorney at the time of the challenged conduct or omission. *See Lockhart v. Fretwell*, 506 U.S. 364, 371-72 (1993). A court's evaluation of "counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Rather than strictly scrutinizing an attorney's every decision, a court must focus on whether counsel's behavior was so unreasonable as to represent a "breakdown in the adversarial process that our system counts on to produce

25

just results." *Id.* at 696. "[T]he record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 687).

If a court finds that counsel was deficient, a petitioner then must establish that he was prejudiced as a result. To establish prejudice, a petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). However, the Supreme Court has emphasized that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

**B.    Eight of Medrano's Claims Are Procedurally Barred**

   **1.    Medrano's Claims Decided on the Merits on Direct Appeal Are Procedurally Barred**

In his direct appeal to the Second Circuit, Medrano argued that the district court erred in accepting his plea because he did not allocute to a knowing participation in the conspiracy and erred at sentencing in determining that 50 or more kilograms of cocaine were at issue in the conspiracy and that Medrano's conduct merited a four-level leadership enhancement under the Guidelines. *See* Cronan Decl., Ex. K (Medrano's appellate brief dated June 28, 2012), at 21-26, 40-42. The Government contends that these claims are now procedurally barred because they were raised in Medrano's direct

appeal and decided by the Second Circuit. Resp. Mem. at 17-24. Medrano's counsel concedes that these arguments, raised in the instant petition as Claims 1, 7, and 8, were previously rejected on the merits by the Second Circuit. *See* Letter from Matthew W. Brissenden dated November 25, 2013 (Dkt No. 45). In his *pro se* motion papers, Medrano also effectively acknowledges that these arguments are the same as those he presented to the Second Circuit; rather than restate the arguments in his *pro se* motion, Medrano directs the Court's attention to his brief on direct appeal. Pet. Mem. at 13.

Medrano has not made any argument as to why these three claims should not be denied as procedurally barred. He has not identified "any intervening change in the law" that would have exonerated him, *see Chin*, 622 F.2d at 1092, nor is the Court aware of any. Medrano also has not argued that there is any new evidence or that the Court should adjudicate these claims to prevent clear error or manifest injustice. Accordingly, the Court will not address the merits of Claims 1, 7, and 8, and recommends that they be denied as procedurally barred.

### 2.    Medrano's Claims Not Raised on Direct Appeal Are Also Procedurally Barred

The Government also contends that Medrano is procedurally barred from making a collateral attack on aspects of his criminal case that he could have raised on direct appeal, but did not. Resp. Mem. at 25-35. Medrano did not appeal his conviction based on the various grounds of prosecutorial misconduct that he now asserts as Claims 9 through 11 and 15, nor did he argue that the district court erred by including a two-level enhancement for obstruction of justice (Claim 14). *See generally* Cronan Decl., Ex. K (Medrano's Brief to Second Circuit dated June 28, 2012). The alleged bases for these claims were known to Medrano when he brought his direct appeal and could have been

27

presented to the Second Circuit. Accordingly, Medrano may not raise them now in a collateral proceeding without demonstrating cause for his failure and actual prejudice, or proving that he is actually innocent. *See Zhang*, 506 F.3d at 166; *Garafola v. United States*, 909 F. Supp. 2d 313, 326 (S.D.N.Y. 2012). However, Medrano has not explained why the Court should excuse this procedural failing. He has not provided any reasons for the decision not to include these claims in his direct appeal nor has he argued that his actual innocence merits the Court's consideration of these claims. Therefore, the Court will not reach the merits of Claims 9 through 11, 14, and 15, and recommends that they also be denied as procedurally barred.[7]

## C.    Medrano's Ineffective Assistance of Counsel Claims Lack Merit

Medrano also raises five ineffective assistance of counsel arguments.[8]   He

---

[7] Moreover, with respect to Claims 9 through 11 and 15, it is likely that, had Medrano raised these claims on appeal, the Second Circuit would have rejected them for the reasons the Government articulates. *See* Resp. Mem. at 30-31. "It is well settled that a defendant's plea of guilty admits all of the elements of a formal criminal charge and, in the absence of a court-approved reservation of issues for appeal, waives all challenges to the prosecution except those going to the court's jurisdiction." *United States v. Yousef*, 750 F.3d 254, 258 (2d Cir. 2014) (quoting *Hayle v. United States*, 815 F.2d 879, 881 (2d Cir. 1987)) (internal quotation marks omitted); *see also Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."); *Aquino v. United States*, No. 12-CV-4964 (HB), 2013 WL 1880772, at *1 & n.2 (S.D.N.Y. May 6, 2013) (by guilty plea petitioner waived claims regarding grand jury testimony); *Garafola*, 909 F. Supp. 2d at 329 (by guilty plea, petitioner waived prosecutorial misconduct claim); *Tremblay v. United States*, No. 08-CV-7030 (JFK), 2009 WL 1055007, at *7 (S.D.N.Y. Apr. 20, 2009) (denying habeas petition contending that prosecutor failed to present exculpatory evidence to grand jury).

[8] While Medrano lists seven ineffective assistance of counsel claims in his *pro se* motion papers, there is some overlap. Claims 2 and 12 relate to Galindo's counsel during plea negotiations, while Claims 4 and 13 relate to Robin's alleged conflict of interest. *See*

previously made these arguments in his direct appeal, but the Second Circuit declined to reach these claims, finding that they "are better presented in a 28 U.S.C. § 2255 petition presenting all factual and evidentiary matters." 511 F. App'x at 43. Accordingly, the Court will address the merits of these claims. Specifically, Medrano argues that his trial counsel, Cristobal Galindo, was ineffective for failing to: (1) move to dismiss the indictment for a violation of the Speedy Trial Act (Claim 5), Pet. Mem. at 12-13; (2) argue at the suppression hearing that the search of Medrano's vehicle exceeded the scope of his consent (Claim 6), *id.*; (3) fully inform him about the Government's plea agreement and advise him of the consequences of an open plea (Claims 2 and 12), *id.* at 28-33; Pet. Reply at 29-31; and (4) properly investigate certain issues prior to the *Fatico* hearing (Claim 3), Pet. Reply at 31-32. Medrano also argues that his counsel at sentencing, Avrom Robin, had an actual conflict which adversely affected his performance (Claims 4 and 13). Pet. Mem. at 33-36; Pet. Reply at 16-29. With respect to the claims regarding counsel's performance during the plea negotiations and the *Fatico* hearing, Medrano contends that there are factual issues necessitating a hearing. Pet. Reply at 29-32. As explained below, the Court recommends that all of Medrano's ineffective assistance of counsel claims be denied without a hearing.

      **1.**      **The Claims that Galindo Was Ineffective**

          **a)**      **Failure to Move to Dismiss the Indictment on Speedy Trial Act Grounds (Claim 5)**

Medrano claims that Galindo was ineffective for failing to move to dismiss the indictment against him on Speedy Trial Act grounds, 18 U.S.C. §§ 3161 *et seq.* Pet. Mem. at 12-13 (incorporating argument from direct appeal, *see* Cronan Decl., Ex. K

---

Pet. Mem. at 11-13.

29

(Medrano's appellate brief dated June 28, 2012), at 35-37).  The Speedy Trial Act

generally requires that a criminal trial begin no later than 70 days after the indictment

or information is filed or the defendant appears.  18 U.S.C. § 3161(c)(1).  However, time

may be excluded from this 70-day calculation for a variety of reasons.  *Id.* at § 3161(h).

Because there was no Speedy Trial Act violation, Galindo was not ineffective for failing

to raise such an argument, and this claim should be denied.

In calculating the amount of time excluded under the Speedy Trial Act, Medrano

appears to have misread the record regarding the exclusion of time from November 20,

2007 through February 22, 2008, claiming that the district court only excluded time

through January 3, 2008, leading to 50 days of un-excludable delay.  *See* Cronan Decl.,

Ex. K, at 36.  If this reading were correct, there would have been a total of 71 days of

un-excluded delay.  However, although the docket sheet itself reflects exclusion of time

only through January 3, 2008, *see* Cronan Decl., Ex. A (Criminal Docket), at 13, the

transcript of the hearing on November 20, 2007 reflects that the district court actually

excluded time through February 22, 2008.  *See* Cronan Decl., Ex. CC (Nov. 20, 2007

Hearing Transcript), at 3-4.  The other periods of un-excluded time add up to less than

three weeks.  *See* Cronan Decl., Ex. A (Criminal Docket); *see also* Affidavit of Cristobal

Galindo dated June 13, 2013 ("Galindo Aff.") (Cr. Dkt. No. 90) ("I never advised my

client to argue a [S]peedy [T]rial [A]ct violation because according to my calculations

there was not a violation.").  Because there was no Speedy Trial Act violation, Galindo

was not ineffective for failing to make a motion to dismiss on this ground nor could

Medrano have suffered any prejudice as a result.  *See, e.g., United States v. Noble*, 363

F. App'x 771, 773 (2d Cir. 2010) ("An attorney's failure to make a meritless argument

does not amount to ineffective assistance.") (citation and alterations omitted).

Accordingly, this claim should be denied.

### b)   Failure to Argue that the Officers' Search of Medrano's Vehicle Exceeded the Scope of Medrano's Consent (Claim 6)

Medrano also incorporates in this petition his argument presented to the Second Circuit that Galindo was ineffective "insofar as he failed to argue that the extent of the search exceeded the scope of [Medrano's] purported consent." Cronan Decl., Ex. K, at 37. In particular, he contends that "the wholesale destruction of both vehicles, far exceeded the reasonable scope which might be inferred from the verbal consent that was allegedly obtained." *Id.* at 39. Because Galindo did, in fact, make this argument both during the suppression hearing and in his post-hearing briefing, the Court recommends that this claim be denied.

During the suppression hearing, Galindo elicited testimony from Officer Hilderbrand and Detective Moore useful to support the argument that the search of Medrano's car exceeded the scope of his consent. *See, e.g.,* Suppression Tr. at 27-29, 32 (asking Officer Hilderbrand about ripping up upholstery in Medrano's vehicle and whether Medrano got upset); 31 ("The bottom line is, Officer Hilderbrand, is that you tore these two vehicles apart, correct?"); 53-54 (asking Detective Moore about damage to both vehicles); *see also id.* at 62 (asking Medrano whether he "protest[ed] the search that Officer Hilderbrand was conducting"). Moreover, in Medrano's post-suppression hearing brief, Galindo argued that Officer Hilderbrand "went beyond the original scope of the consent when he began to tear up the vehicle. . . . This violated the Fourth Amendment's proscription against unreasonable searches and seizures." Cronan Decl., Ex. E (Supplemental Brief in Support of Defendant's Motion to Suppress Evidence filed

Sept. 19, 2008), at 9. This point was presented as an alternative to the main argument that Medrano's alleged consent was not valid. *See generally id.*; *see also* Cr. Dkt. Nos. 32, 37 (Motion to Suppress).

While making both arguments, Galindo decided to emphasize Medrano's lack of consent rather than the scope of the search, and this was a reasonable strategy, particularly in light of Medrano's repeated statements that he "did not consent to the search of [his] car" at all. Cronan Decl., Ex. C (Affidavit of Sergio Medrano dated July 1, 2008), at ¶ 2; *see also* Suppression Tr. at 60, 65. "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington*, 131 S. Ct. at 789 (quoting *Strickland*, 466 U.S. at 689); *cf. Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (ineffective assistance if "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker") (citation omitted). Therefore, given the record Galindo previously developed at the suppression hearing and in his briefing, this claim should be denied.

### c)    Failure to Advise Medrano Regarding the Consequences of His Open Plea (Claims 2, 12)

Medrano also asserts that Galindo provided ineffective assistance during plea negotiations that ultimately led Medrano to plead guilty without a plea agreement in place (an "open plea") rather than accept the plea agreement offered by the Government. Pet. Reply at 30-31. His allegations regarding Galindo's counsel during plea negotiations may be divided into two categories. First, Medrano contends that Galindo "failed to provide him with a copy of the Government's proposed plea agreement, failed to read the agreement to him, [and] failed to accurately describe the

32

agreement." Pet. Reply at 30; *see also* Medrano Aff. ¶¶ 9-10.  Second, he argues that

Galindo did not "instruct him on the risks of entering an open plea versus the benefits

of a plea agreement."  *Id.*  If he had received "accurate information concerning the plea

agreement," Medrano says he "would have pled guilty pursuant to the agreement

instead of entering an open plea."  Medrano Aff. ¶ 12.  The Government argues that

Galindo appropriately advised Medrano about the plea agreement and that, even if

Galindo had not given appropriate advice, Medrano also has failed to demonstrate that

he suffered any prejudice.  *See* Resp. Mem. at 41-47; Resp. Supp. Mem. at 2-7.  The

Court agrees and recommends that these claims should be denied.

　　　"The decision whether to plead guilty . . . is ordinarily the most important single

decision in any criminal case."  *Boria v. Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996)

(quoting Anthony G. Amsterdam, Trial Manual 5 for the Defense of Criminal Cases

(1988)); *see also Pham*, 317 F.3d at 182 (describing it as a "crucial decision").

Accordingly, the right to counsel extends to plea negotiations.  *See Missouri v. Frye*, 132

S. Ct. 1399, 1405-06 (2012).  When evaluating counsel's performance during plea

negotiations under the *Strickland* standard, "[w]ith respect to objective reasonableness,

attorneys must, at the very least, communicate the terms of a plea offer to their

clients."  *United States v. Nunez-Polanco*, 20 F. Supp. 3d 473, 479 (S.D.N.Y. 2014)

(citing *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010)); *see also Frye*, 132 S.

Ct. at 1408 ("[D]efense counsel has the duty to communicate formal offers from the

prosecution to accept a plea on terms and conditions that may be favorable to the

accused.").  In so doing, "[o]ur case law confirms that counsel has a professional

obligation to adequately inform her client about the considerations that are relevant to

her client's decision to accept or deny a plea bargain." *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005); *accord Purdy v. United States*, 208 F.3d 41, 44-45 (2d Cir. 2000). On the prejudice prong, "where a plea offer has . . . been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel," that the prosecutor would not have withdrawn the plea agreement, and the trial court would have accepted it. *Frye*, 132 S. Ct. at 1409.

### i. Failure to Provide the Plea Agreement to Medrano and Describe Its Terms Accurately (Claim 12)

Galindo's alleged failure to provide Medrano with a copy of the plea offer or read its contents to him verbatim does not establish a claim for ineffective assistance of counsel. *See* Medrano Aff. ¶¶ 2, 9. Rather, what matters is that the material terms of the plea agreement have been conveyed and explained, not that the document itself memorializing the agreement is handed to a criminal defendant. *See, e.g., Nunez-Polanco*, 20 F. Supp. 3d at 480-81 (verbally conveying plea offer deemed sufficient); *accord Frye*, 132 S. Ct. at 1408 (duty to "communicate formal offers"); *Purdy*, 208 F.3d at 45 (duty to "communicate to the defendant the terms of the plea offer"). Medrano concedes that Galindo explained to him that the agreement was "an 'open offer' of 'ten to life' which did not commit the Government to any particular sentence," and that, by pleading pursuant to the agreement, Medrano "would be giving up [his] right to safety valve relief." Medrano Aff. ¶ 9. This was an accurate description of the proposed plea agreement. *See* Brissenden Aff., Ex. A (Letter from Assistant United States Attorney Michael D. Maimin to Galindo dated Oct. 14, 2008). Therefore, this claim is without merit and should be denied.

34

### ii.   Failure to Advise Medrano of the Consequences of an Open Plea (Claim 2)

Medrano further contends that Galindo provided ineffective assistance because he "did not explain the benefits of pleading pursuant to the agreement, or the risks of pleading without an agreement." Medrano Aff. ¶ 9. Specifically, Medrano alleges he was unaware that the district court "could base [his] recommended Guidelines sentence upon a much larger amount of cocaine" than described in his plea allocution. *Id.* at ¶ 12. This statement conflicts with Galindo's recollection that he "advised Mr. Medrano in Spanish about the risks of entering a guilty plea without an agreement," including "the government's estimate of Mr. Medrano's guidelines sentencing range without a plea," and that he "reviewed the government's allegations of [the] quantity of cocaine" at issue with Medrano. Galindo Aff. ¶¶ 5-6.[9] However, the Court need not resolve this dispute to adjudicate this claim because Medrano cannot demonstrate prejudice. Accordingly, the Court recommends that this claim also be denied.

Even assuming *arguendo* that Medrano was able to demonstrate that Galindo's representation during the plea process did not meet an objective standard of reasonableness (and the Court does not so find on the record presented), he has not demonstrated prejudice, the second *Strickland* prong. To prove prejudice, Medrano "must show not only a reasonable probability that he would have accepted the lapsed plea but also a reasonable probability that the prosecution would have adhered to the agreement and that it would have been accepted by the trial court." *Frye*, 132 S. Ct. at 1410-11. Here, Medrano's entire argument regarding prejudice centers on his own

---

[9] While the paragraphs in Galindo's affidavit are unnumbered, the language quoted here is taken from the fifth and sixth paragraphs of his affidavit.

decision-making process; he has not presented any facts that demonstrate the likelihood of either the Government adhering to the agreement or the district court accepting it. This deficiency alone is sufficient to find there is no prejudice. *Id.*

Moreover, Medrano's unsupported statement that with better counsel he "would have pled guilty pursuant to the agreement instead of entering an open plea," Medrano Aff. ¶ 12, does not suffice to prove "that he would have accepted the lapsed plea." *Frye*, 132 S. Ct. at 1410-11. "A self-serving post-conviction statement does not, standing alone, establish prejudice." *Hernandez v. Larkin*, No. 12-CV-8090 (AJN) (SN), 2013 WL 4453316, at *12 (S.D.N.Y. Aug. 19, 2013). "This is especially true when [the petitioner] stated in open court that he understood" the consequences of his guilty plea. *Id.* (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) and *Padilla v. Keane*, 331 F. Supp. 2d 209, 217 (S.D.N.Y. 2004)); *accord United States v. Arteca*, 411 F.3d 315, 322 (2d Cir. 2005) (collecting out-of-district cases); *Shi Yong Wei v. United States*, No. 11-CV-6961 (RMB), 2013 WL 980151, at *5 (S.D.N.Y. Mar. 12, 2013) (citing *United States v. Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998)). A petitioner must corroborate his statements with "some objective evidence other than [his own] assertions to establish prejudice." *Pham*, 317 F.3d at 182.

The objective evidence presented in this case, when viewed as a whole, supports a finding that Medrano would not have accepted the Government's plea offer, and therefore could not have been prejudiced by Galindo's alleged ineffectiveness. Objective evidence that may support (or undermine) a petitioner's statement that he would have, with effective assistance of counsel, accepted a plea agreement includes (1) a sentencing disparity between the sentence offered and the sentence received, *see Pham*, 317 F.3d

at 182-83; (2) a petitioner's insistence on his innocence, *see Cullen v. United States*, 194 F.3d 401, 407-08 (2d Cir. 1999); or (3) a petitioner's withdrawal of his guilty plea, *see Gonzalez*, 722 F.3d at 133.[10] Here, perhaps most importantly, Medrano confirmed at the plea hearing that he had the opportunity to discuss his case with Galindo, including the consequences of his plea, and that he was satisfied with Galindo's representation. *See* Plea Tr. at 4, 8-9, 10-11. These "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74.

Moreover, the record supports the conclusion that Medrano would not have accepted the plea agreement because it precluded safety valve relief. For instance, Assistant U.S. Attorney Maimin recalls that Galindo asked him about the availability of safety valve relief under the plea agreement, and emphasized Medrano's desire for such relief. Maimin Decl. ¶¶ 7-9. More directly, at the end of Medrano's plea allocution, Galindo emphasized that Medrano wanted to preserve his right to "debrief" the safety valve relief issue, and the district court responded, "Yes. I infer from the fact that a plea agreement was not executed that the defendant wants to preserve the right to seek a safety valve sentence." Plea Tr. at 19. Galindo confirmed this assertion, and

---

[10] While there is "a significant disparity" between the high end of the recommended sentence range under the plea agreement (151 months) and the sentence Medrano received after pleading guilty without an agreement (262 months), this fact is not dispositive of prejudice. *See Mickens v. United States*, No. 97-CV-2122 (JS), 2005 WL 2038589, at *3 (E.D.N.Y. Aug. 17, 2005) (The discussion in *Pham* on sentencing disparity "does not present an absolute rule. Where other objective factors indicate that acceptance was not likely or impossible, a defendant's prejudice claim may still fail."), *aff'd*, 257 F. App'x 461 (2d Cir. 2007). The sentencing disparity standing alone does not support a "prejudice" finding both because, pursuant to the terms of the proposed agreement, the district court was not bound to accept the recommended Guidelines sentencing range, and given the other circumstances surrounding Medrano's plea discussed herein.

Medrano did not object to this characterization. *Id.* Given that the Government's plea offer would have required Medrano to give up safety valve relief, it is plain Medrano rejected it for that reason, not because Galindo otherwise failed to advise him about the consequences of such a plea.

Finally, while Medrano has not argued that he is completely innocent, he has continued to maintain his innocence with respect to the 180-kilogram shipment of cocaine as he did during his safety valve proffer session and at the *Fatico* hearing. *See, e.g., Cullen*, 194 F.3d at 407-08 (maintenance of innocence considered when evaluating whether petitioner would have accepted plea); *Muyet v. United States*, No. 03-CV-4247 (PKL), 2004 WL 2997866, at *6 (S.D.N.Y. Dec. 27, 2004) (same). Viewed in this light, Medrano's attempt to withdraw his guilty plea can be seen, not as indicative of ineffective assistance of counsel, but rather as a failed "gamble" on his ability to qualify for safety valve relief, as the Government posits. *See* Resp. Mem. at 46; *see also Gonzalez*, 722 F.3d at 133 (motion to withdraw guilty plea is not dispositive of prejudice). Medrano's motion to withdraw his guilty plea only came after his unsuccessful safety valve proffer session and after the full extent of his involvement in the conspiracy was laid bare during the *Fatico* hearing. *Id.* at 46-47; Resp. Supp. Mem. at 7; Maimin Decl. ¶ 11 (at proffer session Maimin described to Medrano the amount of cocaine he would attempt to prove at *Fatico* hearing). For all these reasons, this claim should be denied without a hearing.[11]

---

[11] Medrano has requested a hearing to resolve any factual disputes regarding this claim, but the Court finds that one is not warranted because Medrano has not presented a plausible claim for ineffective assistance of counsel (nor explained what a hearing would add beyond the record already before the Court). Here, for the reasons discussed, Medrano's claim "is itself far-fetched and completely contradicted by [two]

### d) Failure to Investigate for *Fatico* Hearing (Claim 3)

Medrano's final contention regarding Galindo's representation is that he was ineffective for failing to investigate the potential testimony of four individuals who Medrano asserts would have exculpated him with respect to the 180-kilogram cocaine shipment. Specifically, Medrano wanted Galindo to call Cleofas Contreras Vasquez, Juan Nicholas Ordenas, Enrique Hinojosa Acevedo, and Juan Ernesto Garcia as witnesses at the *Fatico* hearing.[12] Medrano argues that because Galindo's strategy at the *Fatico* hearing included taking the position that Medrano was not the man named "Toca" responsible for the largest of the alleged cocaine shipments, he should have spoken to the individuals Medrano identified as being able to offer testimony on this point. Pet. Reply at 31. The Government responds that Medrano was not prejudiced by Galindo's alleged failing because the four individuals' testimony would have been both cumulative and irrelevant. At the *Fatico* hearing, the Government stipulated that there were two individuals in the conspiracy named "Toca," but that its witnesses (O'Neill and Medina) identified Medrano as the "Toca" to which they referred, and the district court credited this testimony. Resp. Mem. at 47-49. Thus, the Government argues, "[n]o amount of additional investigation could have made the existence of another 'Toca' in another branch of the conspiracy relevant to this case." *Id.* at 48. For the reasons that follow, the Court recommends that this claim be denied.

---

detailed affidavits, as well as the transcript of his plea colloquy." *Wang v. United States*, 458 F. App'x 44, 46 n.1 (2d Cir. 2012).

[12] Adolfo Vasquez, whom Galindo identified at the *Fatico* hearing, apparently is also known as Enrique Hinojosa Acevedo. *See* Cronan Decl., Ex. N (Order dated Jan. 29, 2010); Pet. Reply at 31 n.7.

It is well-established that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  However, the duty to investigate does not require "defense counsel to investigate comprehensively every lead or possible defense . . . or 'to scour the globe on the off-chance something will turn up.'"  *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)); *accord Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

"To successfully assert an ineffective assistance of counsel claim based on a failure to investigate, a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *United States v. Peterson*, 896 F. Supp. 2d 305, 316 (S.D.N.Y. 2012) (citation omitted).  In this Circuit, courts have regularly denied ineffective assistance of counsel claims where the petitioner did not provide affidavits from the potential witnesses describing their unrealized testimony. *See, e.g., Chavez v. United States*, 764 F. Supp. 2d 638, 644 (S.D.N.Y. 2011); *Taylor v. Poole*, No. 07-CV-6318 (RJH) (GWG), 2009 WL 2634724, at *14-15 (S.D.N.Y. Aug. 27, 2009); *Halo v. United States*, No. 06-CV-5041 (ARR) (RLM), 2007 WL 1299158, at *13 (E.D.N.Y. Apr. 30, 2007); *Carneglia v. United States*, No. 03-CV-6388 (ADS) (ARL), 2006 WL 148908, at *4 (E.D.N.Y. Jan. 18, 2006).

Here, despite Medrano's request, Galindo never spoke with the four individuals Medrano identified. *See* Affidavit of Cristobal Galindo dated November 24, 2014

("Supp. Galindo Aff."), at 2 (Cr. Dkt. No. 106); *see also* Fatico Tr. at 201; Cronan Decl.,
Ex. M (Letter from Assistant United States Attorney Michael D. Maimin dated Aug. 14,
2009), at 3.  Galindo affirms he "investigated [the witnesses'] potential testimony," but
acknowledges that he "never spoke to any of the witnesses."  Supp. Galindo Aff. at 1-2.
However, Galindo explains that he deemphasized this aspect of his *Fatico* hearing
preparation because the "witnesses could not refute the evidence and witnesses that the
government had against [Medrano]."  *Id.*  After the Government agreed to stipulate to
the fact that "another Toca" was involved in the conspiracy, Galindo focused on other
arguments.  *Id.*  Medrano disputes Galindo's representations, countering that he told
Galindo he "believed" these witnesses "had information that Cuco and 'the other Toca'
were the true source of [the] 180 kilo shipment."  Affidavit of Sergio Medrano dated
January 7, 201[5] ("Supp. Medrano Aff."), at ¶ 3 (Dkt. No. 44).  The Court need not
resolve this dispute at a hearing, however, because even if Medrano's recollection is
correct, he has not met his burden to prove any resulting prejudice.

Medrano has failed to "demonstrate that the witnesses would have testified at
[the hearing] and explain the expected nature of the witnesses' testimony" as is
necessary to prove prejudice.  *Taylor*, 2009 WL 2634724, at *15.  Medrano offered only
that he "asked Mr. Galindo to interview and subpoena witnesses to help prove that [he]
was not responsible for the 180 kilogram [cocaine] delivery," Medrano Aff. ¶ 14, and
that he "believed" the four witnesses could speak to that point.  Supp. Medrano Aff. ¶ 3.
He has not provided affidavits from any of the proposed witnesses on the basis of which
the Court could make a determination that Medrano was, in fact, prejudiced by
Galindo's failure to seek out their testimony for the *Fatico* hearing.  Put simply, "such

speculation" does not satisfy "*Strickland*'s . . . prejudice prong[]." *McPherson v. Greiner*, No. 02-CV-2726 (DLC) (AJP), 2003 WL 22405449, at *25 (S.D.N.Y. Oct. 22, 2003), *adopted by*, 2005 WL 2024737 (S.D.N.Y. Aug. 23, 2005); *accord United States v. Thornhill*, No. 11-CR-958 (KMK), 2014 WL 3715438, at *24 (S.D.N.Y. July 28, 2014) ("[P]urely speculative arguments about the impact of an error do not establish prejudice.") (citation omitted).  The Court therefore recommends that this claim be denied.[13]

### 2.    The Claim that Robin Was Ineffective (Claims 4, 13)

Medrano makes one claim with respect to Robin's representation:  that Robin's previous representation of Juan Nicholas Ordenas (who Medrano contends is the "Toca" responsible for the 180-kilogram cocaine shipment) created an actual conflict of interest that adversely affected his representation of Medrano.  Medrano argues that this conflict led Robin to abandon Medrano's motion to withdraw his guilty plea and to fail to argue at sentencing that Ordenas, not Medrano, was responsible for the 180-kilogram cocaine shipment.  Pet. Mem. at 33-36; Pet. Reply at 16-29.  The Government counters that Robin's prior representation of Ordenas created, at worst, a potential conflict, and that Medrano cannot show any resulting prejudice as required under *Strickland*.  Resp. Mem. at 49-56; Resp. Supp. Mem. at 8-10.  For the reasons that follow, the Court finds that Medrano has not demonstrated that Robin labored under an

---

[13] As the Government points out, as a result of Galindo's cross-examination of the Government's witnesses at the *Fatico* hearing, Medrano's sentencing counsel was in a better position to hold Medrano accountable for only half of the 180-kilogram shipment, a result hardly reflective of ineffective assistance of counsel.  *See* Memorandum of Law of the United States of America in Further Opposition to Sergio Medrano's Petition dated January 16, 2015, at 4 (Cr. Dkt. No. 107).

actual conflict of interest nor has he established the necessary prejudice to support an ineffective assistance of counsel claim based on a potential conflict. Therefore, this claim should be denied.

The Sixth Amendment right to counsel includes the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). There are two types of conflicts of interest relevant here: actual and potential. A potential conflict of interest will be found where "the interests of the defendant may place the attorney under inconsistent duties at some time in the future . . . and violate the Sixth Amendment when they prejudice . . . the defendant." *Ventry v. United States*, 539 F.3d 102, 111 (2d Cir. 2008) (internal citations omitted). "Actual conflicts occur when the interests of a defendant and his attorney diverge with respect to a material factual or legal issue or to a course of action, and violate the Sixth Amendment when counsel's representation of the client is adversely affected by the existence of the conflict." *Id.* (citations and alterations omitted); *see also Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) ("An actual conflict, for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.") (quoting *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)) (internal quotation marks omitted). Where there is an actual conflict, prejudice is presumed for purposes of establishing an ineffective assistance of counsel claim. *Eisemann*, 401 F.3d at 107 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)).

In this Circuit, to demonstrate that an attorney's conflict of interest adversely affected his performance, a petitioner must show "that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense

43

was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* (quoting *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003)). This has been described by the Second Circuit as "a two-part showing." *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005). First, with respect to the alternative strategy, a petitioner "need not show that the [alternative defense strategy] would necessarily have been successful had it been used, only that 'it possessed sufficient substance to be a viable alternative.'" *Feyrer*, 333 F.3d at 116 (quoting *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993)). Second, a petitioner must show "causation," that is, that "counsel chose not to undertake [the alternative strategy] because of his conflict." *LoCascio*, 395 F.3d at 56-57 (quoting *Winkler*, 7 F.3d at 309) (internal quotation marks omitted).

Here, Robin acknowledges that he previously represented Ordenas in his criminal prosecution, but only as local counsel. Affidavit of Avrom Robin dated August 5, 2013 ("Robin Aff."), at ¶¶ 7-16 (Dkt. No. 19). Robin explained that he sponsored the admission of a California lawyer to represent Ordenas, and appeared with Ordenas for his initial appearance and arraignment. *Id.* at ¶¶ 9-10. He contends, however, that he met Ordenas "on only two or three occasions," and "never discussed the facts of his case with him." *Id.* at ¶ 14. He added that he was "not involved in [Ordenas'] trial, or in trial planning or preparation in any way." *Id.* at ¶ 15.

The Government argues that Robin's prior representation does not present a conflict because, as local counsel, he was not significantly involved in Ordenas' defense and did not have a basis to realize that Ordenas was the "Toca" who Medrano alleged was responsible for the 180-kilogram cocaine shipment. Resp. Mem. at 52; Resp. Supp.

44

Mem. at 8-9; *see also* Robin Aff. ¶¶ 21-22.[14]  However, the Court finds it hard to believe

that Robin failed to make any connection between his former client and the "Toca" he

discussed with Medrano.  In his sentencing submission, Robin cited to a two-page order

by the district court that referred to his former client as "Juan Nicholas Ordenas

(A.K.A. Toca)" in the first paragraph, and Robin also noted that Galindo proposed

additional witnesses at the *Fatico* hearing, one of whom was Ordenas.  *See* Brissenden

Aff., Ex. D (Sentencing Memorandum filed Jan. 7, 2011), at 8 (citing Jan. 29, 2010

order, appearing as Cronan Decl., Ex. N), and 31.  Additionally, Medrano made the

Ordenas/Toca argument explicitly in his own sentencing submission, which Robin

presumably read.  *See* Medrano Aff., Ex. B (Pro Se Brief in Further Support of a Non-

Guideline Sentence Pursuant to § 3553(a) & (f), undated), at XXII.[15]

However, even assuming Robin knew that Ordenas was the "Toca" Medrano

spoke of, Medrano has not demonstrated that this knowledge constitutes an actual

conflict.  For instance, while analogizing his case to *United States v. Levy*, 25 F.3d 146

(2d Cir. 1994), Pet. Reply at 19, Medrano has not claimed that Robin "possessed

---

[14] In making this argument, the Government relies exclusively on cases from other
circuits for the proposition that an attorney who is unaware of a conflict cannot be
ineffective as a result.  *See* Resp. Supp. Mem. at 8-9.  Although the Second Circuit
has not addressed this question, there are district court cases that appear to stand
for the logical proposition that, if an attorney is unaware of a conflict of interest, it
cannot be the cause of failing to adopt a particular strategy.  *See, e.g., Mileto v.
Philips*, No. 9:03-CV-0353 (NPM), 2007 WL 1746249, at *17 (N.D.N.Y. June 13,
2007); *Graham v. Ricks*, No. 9:02-CV-0303 (NPM), 2004 WL 768579, at *10-11
(N.D.N.Y. Apr. 7, 2004).

[15] Medrano also alleges that he informed Robin of his concern regarding the alleged
conflict after his own legal research uncovered that Robin had previously represented
Ordenas, Medrano Aff. ¶¶ 16-17, though Robin denies ever being aware that the
"other 'Toca'" was Ordenas because if he had, he would have "presented the potential
conflict of interest issue" to the court.  Robin Aff. ¶ 22.  However, Medrano never
raised this concern in his own sentencing submission to the court.

privileged information from his relationship with [Ordenas] that was directly relevant to [Medrano's] defense" such that his "continuing legal and ethical obligations to protect [Ordenas] and his confidences necessarily meant that [Robin's] interests diverged from [Medrano's]." *Levy*, 25 F.3d at 156; *see also Quinones v. Miller*, No. 01-CV-10752 (WHP) (AJP), 2003 WL 21276429, at *31-32 (S.D.N.Y. June 3, 2003) (considering whether prior client shared confidences with petitioner's attorney when evaluating whether attorney had "inconsistent interests"), *adopted by*, 2005 WL 730171 (S.D.N.Y. Mar. 31, 2005), *aff'd*, 224 F. App'x 44 (2d Cir. 2007); *Perillo v. Johnson*, 205 F.3d 775, 799 (5th Cir. 2000) ("Where, however, defense counsel's involvement in the prior representation was either transient or insubstantial, we have been less inclined to find an actual conflict."). Robin's description of his limited representation of Ordenas supports the finding that he did not possess any such confidential information. *See* Robin Aff. ¶ 14 ("I never discussed the facts of [Ordenas'] case with him.").

Medrano also has not demonstrated that this alleged conflict adversely affected Robin's performance. First, there is nothing in the record to suggest that attempting to inculpate Ordenas with respect to the 180-kilogram cocaine shipment would have been a "plausible alternative defense strategy." *Eisemann*, 401 F.3d at 107 (citation omitted). The record, as developed before the district court at the time of sentencing, contained no evidence that Ordenas had anything to do with the 180-kilogram cocaine shipment at issue.[16] It therefore is not clear how the argument could have "possessed

---

[16] Medrano notes that large tractor-trailer shipments of cocaine "fit within [Ordenas'] general *modus operandi*," while "the Government's evidence pointed to a very specific *modus operandi* by [Medrano]—*i.e.*, the use of 'trapped' vehicles to transport relatively small amounts of cocaine." Pet. Reply at 19, 23. Medrano also offers the affidavit of Jesus Dominguez in which he describes transporting cocaine for the

sufficient substance to be a viable alternative." *Id.* (citation omitted); *see also Gindi v.*
*United States*, Nos. 11-CR-294, 14-CV-755 (KAM), 2014 WL 508135, at *9 (E.D.N.Y.
Feb. 5, 2014) ("because there are *no* facts to suggest" that attorney's other client was
involved in petitioner's wrongdoing, an argument inculpating other client "would not
have been plausible").  Second, Medrano has failed to make the causal connection
between Robin's chosen strategy and the alleged conflict.  He has not provided any
evidence to demonstrate that Robin decided not to argue that Ordenas was responsible
for the 180-kilogram cocaine shipment *because of* his "other loyalties or interests."
*Feyrer*, 333 F.3d at 116.  If Robin were so motivated, he likely would not have
encouraged Medrano to make this very argument in his own sentencing submission.
*See* Medrano Aff., ¶ 20.  While Medrano's citation to the New York Rule of Professional
Conduct regarding duties owed to former clients, *see* Pet. Reply at 17 & n.3, might be
interpreted as an argument that this professional rule necessarily prevented Robin
from pursuing Medrano's preferred strategy, a potential violation of the ethical rules is
not dispositive of an actual conflict.  *See Quinones*, 2003 WL 21276429, at *30
("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth
Amendment guarantee of assistance of counsel.") (quoting *Mickens*, 535 U.S. at 176).  It
appears instead that Robin made the strategic decision that any lawyer might have

---

California branch of the conspiracy in the hidden compartment of a tractor trailer
which closely parallels Medina's testimony at Medrano's *Fatico* hearing.  *See*
Brissenden Aff., Ex. J. (Affidavit of Jesus Dominguez dated Nov. 11, 2013); Pet. Reply
at 26-27.  The Government contends that Medina and Dominguez's testimony involve
two different shipments, pointing out that Dominguez was arrested in December 2003
while transporting 46 kilograms of cocaine, not the 180 kilograms Medina described,
and Dominguez proffered that this shipment was the only one he transported in
December 2003.  *See* Maimin Decl. ¶ 16; Resp. Supp. Mem. at 11-14.

made under the same circumstances: to omit the Ordenas/Toca argument from his sentencing submission because nothing in the record supported such an argument.

Similarly, Medrano has not shown that Robin's decision to rescind the guilty plea withdrawal motion was tied to his prior representation of Ordenas. Rather, as Robin argued at length in his sentencing submissions and before the district court, leaving Medrano's guilty plea undisturbed allowed Robin to advocate for (and receive) a two-level reduction in Medrano's sentence for acceptance of responsibility. *See* Second Sentencing Memorandum dated December 12, 2011 (Cr. Dkt. 75).

Were the Court to consider Robin's representation of Ordenas as a potential conflict instead, Medrano has not demonstrated that he suffered any prejudice. To prove prejudice, a petitioner "must show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence." *Gonzalez*, 722 F.3d at 130 (citing *Lafler v. Cooper*, 132 S. Ct. 1376, 1387 (2012) and *Glover v. United States*, 531 U.S. 198, 203 (2001)). First, although Robin did not argue in his sentencing submissions that Ordenas was responsible for the 180-kilogram cocaine shipment, Galindo had already made this argument in a sentencing submission filed prior to withdrawing as counsel (Cr. Dkt. 56, at 7-9), and Robin allowed Medrano to brief this topic as well. *See* Medrano Aff., ¶ 20, Ex. B (Pro Se Brief in Further Support of a Non-Guideline Sentence Pursuant to § 3553(a) & (f), undated), at XXII. Thus, the district court had this very argument before it to consider, and rejected it. There is no basis for the Court to conclude that Medrano's sentence would have been lower had the issue been briefed by Robin instead. Second, with respect to his guilty plea, Medrano has not presented the Court with anything on which to base a determination that, had

he maintained his motion to withdraw his guilty plea, such motion would have been granted by the district court. Nor does he posit what may have happened after such a motion was granted. Therefore, Medrano has not "demonstrate[ed] 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). Finally, by leaving Medrano's guilty plea in place, Robin secured a two-level sentencing reduction, thus aiding Medrano in receiving a less severe sentence than he might otherwise have received.

### III.   CONCLUSION

For the foregoing reasons, I recommend that Medrano's petition for a writ of *habeas corpus* be denied.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner,*

49

*LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92

(2d Cir. 2010); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:   New York, New York
        February 27, 2015

                                                      JAMES L. COTT
                                                  United States Magistrate Judge